IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs March 21, 2017

**STATE OF TENNESSEE v. ROCKY BURTON**

**Appeal from the Circuit Court for Rutherford County**
**No. F-73257  David M. Bragg, Judge**

_____

**No. M2016-00754-CCA-R3-CD**

_____

Defendant, Rocky Burton, was convicted by a Rutherford County Jury of felony vandalism, assault, disorderly conduct, and public intoxication after an incident involving his neighbor.  He appeals, arguing that the trial court erred by allowing the State to use prior convictions to impeach him and that the State's closing argument was improper. Because Defendant opened the door to impeachment by his own testimony and the State did not engage in improper closing argument, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J. ROSS DYER, JJ., joined.

Gerald Melton, District Public Defender, and Russell N. Perkins, Assistant District Public Defender, for the appellant, Rocky Burton.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Jennings H. Jones, District Attorney General; and Shawn Puckett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Defendant lived in the house next door to Kyle Thomas in Smyrna, Tennessee. Defendant's house was separated from Mr. Thomas's house by two driveways and a row of ten-foot-tall bushes.  The bushes blocked the view of Defendant's house from the house that Mr. Thomas lived in with his mother and younger brother.  Mr. Thomas and Defendant kept to themselves and were not friends.

On the morning of June 6, 2014, Mr. Thomas got up around 6:00 a.m. to go to his job as an industrial maintenance technician where he was responsible for "[f]ixing heavy machinery in warehouses, picking up the presses, [and] injecting oil in machines." He "got in his truck, started it up, started backing up" and through his "side mirror" saw Defendant standing on his property. Defendant did not have permission to be on the property and could only get there by walking "through the bushes," "forc[ing] his way through them," or walking all the way down to the street and around the bushes into Mr. Thomas's yard. Defendant was "cussing, hooting, and hollering." Mr. Thomas did not say anything to Defendant and was "minding" his own business while Defendant kept "hollering" and "being obnoxious," basically saying "every word in the book." As Mr. Thomas backed his truck into the street, he noticed that Defendant had a beer bottle in his hand. Defendant threw the bottle, hitting the side of Mr. Thomas's truck "between the cab and the door," causing visible damage. Mr. Thomas was "fearful for his life" because of Defendant's actions.

By this time, Mr. Thomas's mother, Christie, had come outside to see what all the commotion was about. At the time of the incident, she was a corrections officer at the Riverbend Maximum Security Prison in Nashville. Ms. Thomas had been getting ready for work when she heard her son start his truck. She "looked out the window" in time to see Defendant "hollering" at Mr. Thomas, though she could not hear what he was saying while she was inside the house. She went outside and could hear Defendant "hollering." She told Defendant to leave her son alone and told her son to leave for work and "that's when [Mr. Thomas] said, [']no, he threw his beer bottle at my truck.[']" Defendant told Ms. Thomas, "Fuck you, I'll kill you and your family." Ms. Thomas called the police; Defendant went back inside his house.

When the police arrived, they asked both Mr. Thomas and his mother to fill out a statement. Defendant walked to the end of the driveway and continued to use "curse words" and "threatened to kill [Mr. Thomas] and [his] mom, [his] little brother, things in that nature, he kept going on about it." Defendant was standing about five feet away from Mr. Thomas when he made the threats, and Mr. Thomas "could smell the alcohol on his breath" even though he never actually saw Defendant drinking.

Officer Toni Harris of the Smyrna Police Department described Defendant as "very agitated" when she arrived on the scene. As she was talking to Mr. Thomas and "gathering information," Defendant "began approaching us on the sidewalk coming from his house to the Thomas property." He was using "expletives" and "alleging that they had threatened him for far too long, and that it was his house as well." Officer Harris did not think Defendant was making sense and explained to Defendant that Mr. Thomas was merely backing out of his driveway. Defendant informed the officer that he did not "give a fuck." Officer Harris recalled that Defendant was unable to verbalize to the officers anything specific that his neighbors had done to cause him to react in this manner. When

she placed Defendant in handcuffs, he looked directly at Mr. Thomas and threatened to kill him, "cursing significantly." Officer Harris stated Defendant smelled like alcohol.

At trial, the video and audio of the dash camera from Officer Harris's patrol car was entered as an exhibit. While not much is visible from the video because of the direction in which the patrol car was pointed, the audio is clear. At several points during the audio clip, the voice identified as Defendant curses and threatens both Mr. and Ms. Thomas. Defendant was placed under arrest. When Defendant arrived at the jail, he informed the officers that he was a paranoid schizophrenic and was not taking his medication.

Prior to Defendant's testimony, counsel for the State informed the trial court that there was a pretrial impeachment notice[1] filed but that the "lengthy" prior record contained crimes that "are all older than 10 years" so the State would not ask Defendant about the convictions unless he "opened the door."

Defendant testified at trial that he woke up about 5:00 a.m. on the morning of the incident and drank two beers. He explained that there was "no law against drinking a beer." He saw Mr. Thomas back out of the driveway. Mr. Thomas "flipped" him off and it made him "mad" so he walked out into his own driveway and "throwed [sic] a beer bottle at his truck," and "cussed him out." Defendant explained that his "rage" and "animosity" had been "boiling up inside [him] for quite some[ ]time," and on this particular day, he "blew up like a volcano." When he threw the bottle at the truck, he wanted to let Mr. Thomas know that he "had about enough" and that they could "settle it in the street." Defendant admitted that he "threatened to kill [Mr. Thomas], not the family" and claimed that he was "provoked" by Mr. Thomas's prior threats to "blow [his] head off."

Defendant testified that he was a paranoid schizophrenic and that he quit taking his medication because "it wasn't working." Defendant also testified that he was "a law[-]abiding citizen. You know, I mind my own business. I help people in need, you know. I give to charities." Defendant went on to say that he was "not a violent man."

Counsel for the State asked for a conference during which he informed the trial court that Defendant had "opened the door" to impeachment with the prior convictions. The trial court found that Defendant "voluntarily, without any urging from Counsel, he attempted to portray himself as a law[-]abiding citizen, and also stated he wasn't a violent man. I believe he's opened the door for impeachment in those areas on redirect." The trial court further stated, "You can attempt to rehabilitate him if you want to. But I think

---

[1] The pretrial impeachment notice does not appear in the record on appeal.

he opened the door to allow the State to ask him about his prior law[-]abiding or non-violent behavior."

Counsel for the State then cross-examined Defendant about his prior convictions for grand larceny, possession of marijuana, larceny, and malicious shooting. Defendant claimed that the State was "try[ing] to make [him] look like John Dillinger[2] or a villain," but he did not deny that he had prior convictions. For the most part, Defendant attempted to justify his prior illegal acts by blaming them on either someone else or necessity. For example, Defendant admitted that he sold marijuana because he "didn't have a job" but explained that he only "sold a little ounce here, a little ounce there to help pay [his] bills" and "take care of [his] kids" so that they could wear "50 dollar tennis shoes, 20 [dollar] pants, . . . and a 100 dollar leather jacket." Defendant admitted that he was found guilty of malicious shooting but claimed that it was only because there were "these guys breaking in houses," and he tried to "run them off" and "somebody got shot."

Counsel for the State referenced several of Defendant's prior convictions and his claim of being non-violent during closing argument. Counsel for Defendant objected to the argument as improper, but the trial court overruled the objection.

At the conclusion of the proof, the jury found Defendant guilty as charged of felony vandalism, assault, disorderly conduct, and public intoxication. After a sentencing hearing, the trial court sentenced Defendant to an effective sentence of four years as a Range II, multiple offender. Defendant filed a motion for new trial in which he challenged the use of his prior convictions for impeachment and the State's closing argument, among other things. The trial court denied the motion and Defendant filed a timely notice of appeal.

*Analysis*

*Impeachment with Prior Convictions*

On appeal, Defendant challenges the trial court's ruling to allow his prior convictions to be used for impeachment purposes. Specifically, Defendant argues that the trial court did not make the requisite finding of the evidence's prejudicial versus probative value "pursuant to Rule 609 of the Tennessee Rules of Evidence," and as a result, he did not get a fair trial. The State, on the other hand, insists that Defendant waived the challenge under Rule 609 for failing to reference the rule at trial or in his

---

[2] John Dillinger was a notorious Depression-era thief who robbed banks and police arsenals in the Midwest during the 1930s. He and his gang were responsible for killing ten men and wounding seven others, including killing a sheriff and wounding two guards. Federal Bureau of Investigation, *Famous Cases*, https://www.fbi.gov/history/famous-cases/john-dillinger (last visited June 6, 2017).

motion for new trial. The State also argues that the trial court properly allowed the State to use the prior convictions for impeachment purposes.

Ordinarily, a defendant's prior convictions may be used to impeach that defendant if the convictions meet the criteria established by Tennessee Rule of Evidence 609. According to this rule, prior adult convictions may be used to impeach a defendant if:

> (a) the conviction is for a crime punishable by death or imprisonment in excess of one year, or the conviction is for a misdemeanor which involved dishonesty or false statement; (b) less than ten years have elapsed between the date the accused was released from confinement and the commencement of the subject prosecution; (c) the State gives reasonable pretrial written notice of the particular conviction or convictions it intends to use as impeachment; and (d) the trial court concludes that the probative value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues.

*State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999); *see also* Tenn. R. Evid. 609. Initially, we note that the trial court did not allow Defendant's prior convictions to be admitted under Rule 609. Instead, the trial court determined that the State could question Defendant regarding his prior convictions because he testified that he was a "law[-]abiding citizen," opening the door to impeachment. *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012) (finding that "[e]ven if evidence is inadmissible, a party may 'open the door' to admission of that evidence."). A party commonly opens the door "by raising the subject of that evidence at trial." *Id.* Our supreme court has explained, "[w]hen a party raises a subject at trial, the party 'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." *Id.* (quoting 21 Charles Alan Wright et al., *Federal Practice & Procedure Evidence* § 5039.1 (2d ed. 1987)). In other words, "'opening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." *Id.* After a witness has "opened the door," however, an opposing party should introduce evidence on the same subject matter or risk reversible error. *See State v. Riels*, 216 S.W.3d 737, 746 (Tenn. 2007) (trial court erred in ruling that defendant opened the door to unlimited cross-examination concerning details of the crime after defendant expressed remorse to the victims' families); *Gomez*, 367 S.W.3d at 247 (trial court erred in ruling that co-defendant's testimony that defendant would not hurt minor victim opened the door to evidence regarding defendant's prior assaults against co-defendant).

In *State v. Kendricks*, 947 S.W.2d 875 (Tenn. Crim. App. 1996), this Court held that "'[i]rrespective of admissibility under Rule 609 [of Tennessee Rules of Evidence], a conviction may be used to contradict a witness who "opens the door" and testifies on direct examination that he or she has never been convicted of a crime, or to counter some

other facet of direct testimony.'" *Id.* at 883 (quoting Cohen, Sheppeard & Paine, Tennessee Law of Evidence § 609.1 (3d ed.1995)). Here, as in *Kendricks*, "the State was impeaching Defendant's testimony on direct as being less than forthright." *Id.*; *see also State v. Brian Jermaine Dodson*, No. M2011-00523-CCA-R3-CD, 2012 WL 2403624, at *15-17 (Tenn. Crim. App. June 27, 2012) (holding that the trial court properly allowed defendant to be impeached with prior assault convictions after the defendant testified, "I'm not that type of person"), *perm. app. denied* (Tenn. Oct. 17, 2012); *State v. Kenneth Lee England*, No. E2002-00693-CCA-R3-CD, 2003 WL 1877234, at *4 (Tenn. Crim. App. Apr. 11, 2003) (holding that the trial court properly allowed Defendant to be impeached by prior conviction for retaliation for past action after he testified on direct that he never made any threats against his ex-wife for her being a witness against him), *perm. app. denied* (Tenn. Oct. 6, 2003).

We agree with the trial court that the State was entitled to impeach Defendant's testimony that he was a law-abiding citizen with all of his prior convictions despite the fact that they were more than ten years old at the time of trial. By testifying that he was not a violent person who followed the law, Defendant placed his prior criminal record at issue and increased the probative value of his felony convictions. *See, e.g. State v. Jeffrey L. Vaughn*, No. W2012-01987-CCA-R3-CD, 2013 WL 1282331, at *9 (Tenn. Crim. App. Mar. 28, 2013) (probative value of Defendant's 1990 conviction for drug dealing increased appreciably after Defendant testified under oath that he did not sell drugs), *perm. app. denied* (Tenn. Sept. 25, 2013). On cross-examination, the State questioned Defendant about the existence of his prior felonies including grand larceny, possession of marijuana, and malicious shooting. The State's questioning was certainly within the "realm of relevance" of the issue that Defendant raised on direct examination. *Gomez*, 367 S.W.3d at 246. Thus, the trial court did not err in allowing the State to impeach Defendant's testimony with his own prior convictions. Defendant is not entitled to relief on this issue.

*State's Closing Argument*

Defendant also challenges the State's closing argument. Specifically he argues that the State "intentionally referred to and argued facts outside the record that are not matters of common public knowledge" in order to "try to paint a picture of [Defendant] as a violent person." The State insists that the closing argument did not amount to misconduct.

During the State's closing argument, Defendant objected to the following statement as improper argument:

Can you believe anything that [Defendant] testified to? I already mentioned earlier that he very specifically on direct examination said, I'm a

law[-]abiding citizen, I'm a non-violent citizen. But then we had to go through conviction after conviction after conviction for this law[-]abiding citizen.

So, from the beginning, he puts himself out to be something that he's not. I'm not violent. I shoot at people and try to kill them, but that's their fault.

The trial court overruled the objection.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). Closing arguments "have special importance in the adversarial process," allowing the parties "to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008). Attorneys "should be given great latitude in both the style and the substance of their arguments." *Id.* at 131. However, "a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Id.* Although not exhaustive, this Court has recognized five general areas of potential prosecutorial misconduct during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *State v. Trusty*, 326 S.W.3d 582, 607 (Tenn. Crim. App. 2010).

Defendant argues on appeal that counsel for the State argued facts outside the record, trying to portray Defendant as something that he was not, and specifically points to the reference counsel for the State made about the malicious shooting conviction. Defendant makes this argument despite the fact that Defendant admitted that he had a conviction for malicious shooting and tried to justify his actions in shooting another person. While being cross-examined, Defendant actually asked counsel for the State if he could "explain" the conviction. Defendant claimed that the shooting was not his fault in a somewhat rambling statement, saying the people he shot at were "thieves" and that the State was trying to make him look like a "villain." Defendant's own testimony essentially tracks the language of the closing argument. Thus, the prosecutor did not argue facts outside the record. Defendant placed his own credibility at issue when he

claimed that he was a non-violent person.  There was no prosecutorial misconduct.  The trial court did not abuse its discretion in overruling the objection.  Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.


_____
TIMOTHY L. EASTER, JUDGE